(Cuyahoga Co., O., Common Pleas.)

SARA F. DISSETTE v. HENRY C. LOWRIE and CHARLES J. LOWRIE.

------

(1.) An injunction will be refused and the parties left as they are until the legal right can be determined at law, where it appears that greater danger is likely to result from granting than from withholding the relief, or where the inconvenience seems to be equally divided as between the parties. .

*Water-courses defined—*

(2.) A water-course is a stream of water usually flowing in a definite channel having a bed and sides or banks, and discharging itself into some other stream or body of water. The flow of water need not be constant, but must be something more than a mere surface drainage occasioned by extraordinary causes. There must be substantial indications of the existence of a stream which is ordinarily a moving body of water.

(3.) In the absence of express contract and positive legislation as between proprietors of adjoining lands, the law recognizes no correlative rights in respect to underground waters percolating, oozing or filtrating through the earth.

(4.) The rule of law in regard to water-courses and the rights, duties and obligations of riparian proprietors, depend very much upon circumstance. The measure of right in regard to streams and brooks in the country, in farming communities and where the owners are engaged in agricultural pursuits, or the raising of stock, can hardly be taken as the measure of right, duty and obligation in urban communities and upon the out-skirts of a city.

Delivered May 27, 1899.

------

KOHLER, J.

The plaintiff in her petition states, in substance, the following facts constituting her cause of action. She avers that she is the owner of a tract of land on the North side of St. Clair street, in the village of Glenville, Cuyahoga county, Ohio, and that the defendants are the owners of a tract of land on the south side of St. Clair street immediately, opposite the land owned by the plaintiff. That there is a pond of water upon the plaintiff's land which is supplied from a spring upon or just south of the said tract of defendant's land, and from which spring there is a natural water-course across defendants' said tract of land, across St. Clair street and through the land of the plaintiff to said pond, which stream of water has for years been running through a pipe laid in said natural water-course, from which said pond has been supplied with running water. That the defendnts are improving their said tract of land by subdividing the same into lots, opening streets through it, constructing sewers in said streets, and in constructing said sewers defendants will, and they threaten to do so, cut through the said water pipe and divert the water flowing therein and therefrom and totally cut off the supply of water to plaintiff's pond, thereby causing her irreparable injury and damage.

Upon the filing of this petition the judge of the court allowed an injunction order to issue, restraining the defendants, and each of them, from the further prosecution of the work of improving and sewering their said premises. The defendants having been served with process, filed a demurrer to the petition stating as grounds of demurrer, among other things, that the petition does not state facts sufficient to constitute a cause of action. The defendants also filed a motion to vacate the order of injunction previously issued by the court. At the

time of the hearing of this motion, the demurrer to the petition was, with the consent of parties, overruled, and the case, therefore, came on for hearing upon the motion of the defendants to vacate and set aside the order of injunction previously issued.

Before proceeding with the hearing of the testimony the counsel in the case, together with the court, visited the premises, and although it is apparent that substantial changes have taken place in the lay of the land during the time covered by the investigation, this view materially aided the court in understanding and applying the testimony offered in the case. The affidavits on both sides are numerous and, in addition to the affidavits, each party produced a large number of witnesses. There is much conflict in the testimony, and it demonstrates whaat courts and juries have so often felt, that where the question is one of opinion and no strict fact, though that opinion should be founded on scientific principles of professional skill, the injury is painfully unsatisfactory and the answers strangely contradictory. In general, taking all the testimony into consideration, it is made to appear that there was and is a ravine on the plaintiff's land, extending to St. Clair street and across St. Clair street southerly, becoming shallower until it ran out to the level ground, a distance of, perhaps, fifteen or twenty rods, or more, south of St. Clair street, on the lands now owned by the defendant.

Many years ago the owner of the land now owned by Mrs. Dissette constructed a dam across this ravine, perhaps a couple of hundred feet north of St. Clair street, and this created a little lake or pond, the upper end of which came up near St. Clair street. The source of the water which fed this lake is not very clear. The ground on the margin of the lake, at the side of the ravine was of a springy nature, and it is also quite apparent that the water came across St. Clair street from this ravine, to which I have made reference. A number of years ago when Judge Dissette purchased these premises, or Mrs. Dissette purchased these premises, the old wooden dam was taken out and a more substantial structure of stone was constructed, and from that day to this, this little pond or lake upon her premises has been maintained with substantially the same stage of water as before. For a number of years after the property was purchased by the plaintiff it was used for watering stock and for other purposes, excepting, perhaps, domestic or culinary purposes. At times ice was cut from the surface of the lake; it was also used as a fishing pond, but for a number of years last past, and since the city water mains have carried the water out in that vicinity, there has been but little practical use for the water, the chief value of this lake at the present time, in the opinion of the court, being, in effect, that it adds to the attractions of the plaintiff's premises.

The water at the head of the dam is quite deep, twelve feet or more, shade trees surround it, and being near the plaintiff's residence and St. Clair street, its appearance is quite ornamental. At the present time the water runs into this lake from a small tile crossing St. Clair street, and this tile runs thence in a southerly direction to an open spring, or catch-basin, as it has been called, and it is said that the water is brought to this catch basin through a pipe from a point still further to the southeast, and which was originally laid in the bottom of a ravine where the water ran; and Mr. Burton, defendants' grantor, some twelve or more years ago, laid a drain tile from this catch-basin notheasterly to St. Clair street for the purpose of draining his land and rendering the same fit for cultivation.

It is claimed also by the plaintiff that this drain tile placed by Dr. Burton from the catch-basin down to St. Clair street, was laid in the bottom of the ravine where there was a natural water-course, and that the public authorities constructed a sluice-way through St. Clair street so that the water found its way into the head of the lake on plaintiff's premises.

The defendants, Lowrie Brothers, purchased twenty-two acres of this

land from Dr. Burton and others a year or so ago, caused it to be surveyed into about one hundred and fifty lots, upon which streets have been laid out, and they are now proceeding to improve the same by constructing sewers, planting trees, building dwelling houses; and the contention of the plaintiff is that by the construction of these sewers which the defendants are building, or threaten to dig and build, that the supply of water for this lake of the plaintiff's will be cut off and destroyed, and that, therefore, irreparable damage will be done to the plaintiff. It does not appear that the defendants are doing anything other than the improvement of their premises in the manner stated. This purchase on the part of the defendants represents an investment of about fifty thousand dollars; they are expending or have expended, in improvements thereon, about twenty-five thousand dollars more, and that the property is now to be brought into the market.

The nature of the soil of the defendants' property which they are improving, on the surface, and to a depth of about three or four feet, it is of a light sandy nature, but below that it is a quick-sand, or what competent witnesses call a water bearing stratum, in which there are springs of water. Water is found at a few feet from the surface, and the digging of the cellars in the vicinity of the property in controversy, shows that water gathers in the bottom of these cellars.

The principle issue of fact in the case relates to the question whether there has been or is a water-course through the defendants' premises at the point or points indicated, to the plaintiff's premises, thereby feeding or supplying the pond or lake thereon. The plaintiff alleging that there is and for many years has been a well defined stream or water-course running across the defendants' land, across St. Clair street and into the lake or pond of the plaintiff. This, the defendants deny, and the defendants' contention is, while originally there was a ravine extending from St. Clair street southeasterly for some distance over and

through the defendants' land, that the portion of said ravine extending from St. Clair street southward for some distance, was simply a wet marshy piece of ground upon which willows and bushes were growing, and that the water coming down through said swale or ravine was not a running stream or water-course, but that it was in the nature of drainage or waters percolating through the surface of the soil and from the wet and spongy nature of the land, and that the drain tiles which were subsequently put in this ravine were simply for the purpose of collecting this percolating water and carrying it to St. Clair street, in order to make the soil dry and render it fit for cultivation.

There are other issues of fact which the evidence presents, the defendants claiming that the lake or pond upon the plaintiff's premises, is of no value; that it should be abated as a nuisance; that the water is impure and unwholesome, giving forth noxious odors, rendering the neighborhood dangerous and unhealthy; that the abatement of this pond and the filling up of the same, instead of being an injury to the plaintiff, would be a pecuniary benefit to the plaintiff and render her land more valuable than it is now, and that, therefore, the cutting off of the water is not a damage to the plaintiff of which she can complain.

The plaintiff, on the other hand, insists that the water is pure and wholesome, and that in years past it has been used in the manner hereinbefore stated. And considerable testimony has been offered to the court along this line, pro and con.

The motion of the defendant raises certain other legal objections to the allowance of the order of injunction, which are really involved in the demurrer, but which also come up for consideration on this motion, and these are stated in the motion, and it is, perhaps, not necessary to reiterate them.

The remedy by injunction is provided by section 5572 of the Revised Statutes, and it is claimed that the petition does not set forth a cause of

action sufficient under this section, and that there is no allegation that the plaintiff is in possession and enjoyment or control of her premises; that there is no allegation that her property will not be just as valuable without the pond as with it. The allegation that she would suffer irreparable injury, it is claimed is merely the statement of a legal conclusion, and in the absence of a statement of facts showing wherein or how she is injured, is not sufficient.

It is urged that the petition must not only show, but the plaintiff must establish that she would suffer material and substantial injury by the acts of the defendants. It is urged also that there is not an allegation in the petition to show that the pond or lake upon the plaintiff's premises was or had been at any time for years applied to any use, and that inasmuch as there is nothing in the petition to show that she was using it for any domestice, manufacturing or agricultural purposes, that, therefore, there are no facts in the petition that the destruction of this pond would be of any damage whatever to the plaintiff. There is an allegation in the petition that the defendants or either of them are insolvent or unable to respond in damages for any judgment that might be obtained against them in an action at law.

These questions have been discussed by counsel, but in disposing of the questions involved, the case being one of equitable cognizance, taking anything into consideration, the inadequacy perhaps of any legal remedy growing out of the continuous nature of the trespass or supposed trespass complained of, I am not disposed to take a technical view of the allegations of this petition, and feel disposed to give the allegations of the petition a liberal construction so that it may cover not only what is expressly alleged and stated therein, but also such facts as are fairly and necessarily implied from what is so stated.

The code provision in regard to an order of injunction is as follows:

"When it appears by the petition that the plaintiff is entitled to the re-lief demanded, and such relief or any part thereof consists in restraining the commission or continuance of some act, the commission or continuance of which during the litigation would produce great or irreparable injury to plaintiff, then a temporary injunction may be allowed."

The granting of an order of injunction is the exercise of a high power, and the section above quoted, therefore, properly limits it to cases where the plaintiff is in danger of sustaining great or irreparable injury. The burden of proof, therefore, is upon the plaintiff, and she must establish her allegations by a preponderance of the evidence.

And in respect to such application, Brinkerhoff, J., in Kellogg v. The Treasurer of Lorain County, 15 Ohio St., 66, uses the following language:

"It is not for every threatened violation of the legal rights of a party that a court of equity will intervene with its preventive remedy by injunction, even in cases where that remedy would be sufficient. A party appealing to a court of equity must make a case which can command itself to the conscience of the court."

Again, in the case of Cincinnati Consolidated Street Railway Company v. The City of Cincinnati, 1st Bulletin, 134, the court used the following language in respect to the equitable remedy of injunction:

"The court is governed by a consideration of the comparative mischief or inconvenience to the parties which may arise from granting or withholding the injunction, and will take care so to frame its order as not to deprive either party of the benefit he is entitled to, in the event it turns out that the party in whose favor the order is made, shall be in the wrong. If upon the balance of convenience and inconvenience it appears that a greater damage would arise to the defendant by granting the injunction in the event of its turning out afterwards to have been wrongfully granted than to the plaintiff from withholding it in the event of the legal right proving to be in his favor, the injunction will not be granted. The burden lies upon the

plaintiff and the party applying for the injunction, of showing that his inconvenience exceeds that of the defendant. He must make a comparative inconvenience entitling him to the interference of the court. In balancing the comparative convenience or inconvenience from granting cr withholding the injunction, the court will take into consideration what means it has of putting the party who may be ultimately successful, in the position he would have stood if his legal rights had not been interfered with."

Quoting again from High on Injunctions, vol. 1, sec. 10: "The utmost care should be observed in the exercise of the injunction, and relief should only be allowed upon a clear necessity being shown of affording immediate protection to some right or interest of the party complaining which would otherwise be seriously injured or impaired. The right to a preliminary injunction is not *ex debito justiciae*, but the application is addressed to the sound discretion of the court to be guided according to the circumstances of the particular case." Again, "Where the legal right is not sufficiently clear to enable a court of equity to form an opinion, it will generally be bestowed in deciding an application for a preliminary injunction, by considerations of the relative convenience and inconvenience which might result to the parties from the granting or withholding of the right. And where upon balancing such considerations, it is apparent that the act complained of is likely to result in irreparable injury to the complainant and the balance of the inconvenience preponderates in his favor, the injunction will be granted; but where, upon the other hand, it appears that greater danger is likely to result from granting than from withholding the relief, or where the inconvenience seems to be equally divided as between the parties, the injunction will be refused and the parties left as they are, until the legal right can be determined at law."

Perhaps these references are sufficient as showing the general rule which control courts in the exercise of this jurisdiction, and guided by these principles, I will come at once to the main point of contention in this case: First, has the plaintiff, by evidence, made it sufficiently clear to the court that there was at the time of the application of this order, a water-course upon the defendants' land running to and upon the plaintiff's premises, in the sense in which the term "water-course" is used in the law?

In ordinary acceptation, the term water-course is generally very accurately understood. In farming communities and where brooks, rivulets, small streams and rivers exist, there can be very little misunderstanding or misapprehension in regard to what is meant by a water-course, but it has been defined by the courts in numerous cases as follows: "A water-course is a stream of water usually flowing in a definite channel having a bed and sides or banks, and discharging itself into some other stream or body of water. The flow of water need not be constant, but must be something more than a mere surface drainage occasioned by extraordinary causes. There must be substantial indications of the existence of a stream which is ordinarily a moving body of water."

Angell on Water-course, sec. 4, "It need not be shown to flow continuously, and it may at times be dry, but it must have a well-defined and substantial existence. A mere right of drainage over the general surface of land is very different from the right to the flow of a stream or brook across premises of another."

The cases on this subject are exceedingly numerous, but the above definition is generally adopted, and in regard to this question as a matter of fact, the testimony is exceedingly conflicting. Witnesses on both sides of high character and intelligence, and whose memory goes back to almost pioneer times, have testified pro and con in regard to his so-called stream, and it would take much longer time than I can give to the decision of this question to review in detail the testimony so presented to the court.

The land now occupied and owned

by the defendants, has been to some extent filled up. It is cultivated, and on the surface it shows no trace or indication of flowing water or a watercourse. Dr. Burton, the defendants' grantor, some ten or twelve years ago, in order to dispose of the water that arose and sometimes overflowed at the so-called spring or catch-basin, laid a pipe through the swale or ravine down to St. Clair street, and some witnesses claim that at St. Clair street it ran in a ditch westerly along by the cemetery; and on the other hand, it is claimed that that was impossible owing to the higher character of the ground of the cemetery, but that it ran through a sluice across St. Clair street into this pond, and from this pond down to Englehart brook through a ravine. After this pipe was laid by Dr. Burton, the ravine was to some extent filled up to that point, so that now, and for ten or twelve years back perhaps, it has been tillable land and used for the purposes of market gardening. The petition lays the stream of water through and from this catch-basin to and across St. Clair street.

Now, I have selected a few witnesses on both sides of this proposition as representative of the mass of testimony on both sides. First, there is Mrs. Johnson, the widow of the former owner of the land now owned by Mr. N. B. Clark lying adjacent to and north of defendants' premises. She avers that years ago a water-pipe was put in a ravine running from the Clark property down upon this land of the defendants, and thence down to the catch-basin, and that this water-pipe was laid in a channel where the water naturally run as a stream. This testimony appears by affidavit, and her son, Mr. Johnson, corroborates his mother mainly in her recollection of this condition of the flowing water. And it is but just to say that a large number of other witnesses testified to the existence in former times and, indeed, down to within ten or twelve years, of a stream of water perhaps small in volume, extending from this catch basin down St. Clair street and across St. Clair street to the plaintiff's premises.

And on the part of the defendants a large number of witnesses with equal positiveness testify that while the land of the defendants at that time and down until it was piped and drained by Dr. Burton, was simply a swale or marshy swamp bottom, over which the surface water spread, being the drainage from the lands higher up, but that it never acquired the character of a stream with a bed and banks and flowing in a well-defined direction.

There are two witnesses on the part of the defendants whose opportunities for observing were such, that I think I may call attention to their testimony. The first is Dr. Burton, the former owner or part owner of the premises how owned by the defendants. His testimony is that there was no water-course there other than that the ground was wet and boggy and generally unfit for cultivation in that ravine; that the water spread over it up as far as the catch-basin, and that he put the pipe in himself down to St. Clair street for the purposes of drainage, filled the pipe over with soil, and that from that time to this the land has been cultivated. He avers that there was no connection with the plaintiff's pond that he knew of, and that if any pipe was laid across, or sluice-way put in across St. Clair street connecting with this drain tile of his, he had no knowledge of it. But he testifies with positiveness that there was no water-course there such as I have defined.

In addition to this is the testimony of Mr. Albert Kreuger, who testifies that for the past twenty-two years he has been entirely familiar with this property; that about fifteen years ago while living on said property as a tenant in order to secure better facilities for gradening, he inserted a catch basin at a point about three hundred feet from St. Clair street; that where the water came from that entered this catch-basin he did not know, but that it was an under-ground supply, and that there never has been within twenty-two years, any water-course on the land of the defendants running across and over said lands. And further, that during all of the time

prior to the date of the inserting the catch-basin, the land being naturally low from this point westerly towards St. Clair street, was marshy and wet at certain seasons of the year, causing such an overflow at said point last above mentioned, but that during a large portion of the year, it was absolutely dry. And he avers further, that the water did not and never has in the memory of affiant crossed St. Clair street in any natural manner.

Now in this conflict of testimony between the plaintiff and the defendants, as to the existence or non-existence of this water-course or water-supply, I have placed great reliance upon the testimony of Mr. Brown, whose knowledge as a civil engineer and whose fairness and candor as a witness greatly impressed me.

Mr. Brown came to Glenville about the year 1873, and since that time he has been familiar with the Lowrie property, and states that the first recollection he had of the property there was a low place filled with willows, alders and swamp weeds extending along up diagonally towards the barn that stands on the premises, and sometimes", he says, "I noticed water running in it; I could not say whether the water ran at all times of the year, but when they improved St. Clair street, I found there had been a provision made to carry water across the street at that point; there was a stone box culvert there, that was in 1888 or 1889," and he says, "I think there was some water running through it." And in answer to a question he says, "My recollection is there was more water there at times than there was at others. It seemed to be sometimes after heavy rains that water would be increased, and it seemed to me to be necessary to build a drain to take away water that came in that part of St. Clair street." Mr. Brown was then asked this question: 'During your recollection, was there at any time upon the Lowrie property, running upon the surface of the soil, any creek, river, rivulet or water-course formed by water running through a channel in which there was a bed and banks made by the water itself." And his answer was: "I can't say that there was any channel or any banks made by the water, but I remember a low place or a swale that extended diagonally across that property, although I don't remember any running stream in the center of it."

And in respect to this bubbling spring called the catch-basin, he was asked the question, "Is there a bubbling spring there out of which water comes and runs off in a channel beyond the spring, or was there at the time of the beginning of this action?" And he answered: "The water gathers, comes in there and gathers there, because it is lower than any point around it, and that land being underlaid with strata saturated with water, of course, the water would gather there." In answer to a question by the court Mr. Brown stated as to the source of the water that made its appearance at the spring or catch-basin, stated as follows: "I should say that it is water that is discharged from a statum of quick sand saturated; I should say that the swale had been a gathering place for that water, and was conducted to the pipe."

Taking all this testimony into consideration pro and con, in connection with what is still apparent and observable, can not find that the testimony of the plaintiff as to the existence of a water course within the proper meaning of that term, shows that it never existed upon the defendants' land. That there was a ravine there, and that it fias low and wet at places, and that water ran through it most of the year, making the land in places swampy, overgrown with bushes, etc., and that the water from that location went through the sluice into the plaintiff's pond, is doubtless true; but the evidence that it ever had the character of a water-course within the meaning of the law, is not sufficiently clear to enable the court to so find.

The land doubtless from the catch-basin down and from the catch-basin southwesterly as springy, full of springs, or, in the language of Mr. Brown, it was a water-bearing strata. This water percolates through the soil and was gathered into a drain for the

purpose of drainage, that the land thereby became dry or reasonably so, ana fit for cultivation and I am inclined to think from all the evidence, that the water appearing in this spring or catch-basin, is explained by the fact that it was conducted as water percolating through the soil and carried in a drain-tile to that point.

Now, supposing this spring or catch-basin from which Dr. Burton laid the tile at St. Clair street and which is described in plaintiff's petition to have been caused by percolating water as I have described it, what is the law?

It seems to me that the case of Frazier v. Brown, 2th Ohio St., 294, is clearly and strongly in point. In that case, Judge Brinkerhoff reviews at great length, surface and sub-surface streams and water-courses, and I quote from the syllabus:

"In the absence of express contract and positive legislation as between proprietors of adjoining lands, the law recognizes no correlative rights in respect to underground waters percolating, oozing or filtrating through the earth. Hence, where a land-owner digs a hole in his own land for purposes connected with the use of his own land thereby cutting off or diverting underground waters which have always been accustomed to percolate and ooz through his land to the land of an adjoining proprietor and there to form the source of a spring or rivulet, any damage thereby occasioned to such adjoining proprietor, is damnum absque injuria."

I have not the time to go further into this point of the case, and perhaps, I might stop here; but there are other propositions advanced and points made that ought not to be overlooked.

The claim is made by the defendants that there is really no injury to the plaintiff; no injury which the law would recognize even though the stream is cut off. If this is a water-course, as the plaintiff claims, then the use which the plaintiff sees fit to make of it on her own premises, so long as that use is lawful, is neither here nor there; whether she uses it for a fish pond or for the purposes of ornament or for watering stock or for manufacturing purposes, is a matter of which the plaintiff and the owner is exclusively the judge. If this stream coming down into this lake has the character of a water-course, then the plaintiff has the right to use it in any manner she sees fit.

In answer to this it is claimed that the pond is really a nuisance; that it contains the germs of disease; that it is of no pecuniary value, in fact an injury to the plaintiff's premises. And in this connection the Lowrie Brothers both file affidavits tending to show that Judge Dissette as the plaintiff's agent, recognized it as such, and was anxious to have it filled up, and in fact contracted with defendants to fill in a certain portion of that pond at the upper end, and that they did put in some two hundred years of earth filling in the pond a part of the way from St. Clair street back into the lake, and that Judge Dissette wished to have it wholly filled up, and that his premises would be of more value when the lake was filled up and made level, than it is now. And this testimony is perhaps relevant upon the question which the case presents, whether or not the plaintiff has sustained or is in danger of sustaining great and irreparable damage. And also in support of this contention there is the testimony of a physician living in the neighborhood who ascribed the fact that certain of his patients living near that lake or pond were stricken with typhoid fever, which he says, in his opinion, is due to the existence of this lake or pond, and the stagnant and unwholesome water it contained.

I do not remember that Judge Dissette contradicted the testimony of Lowrie Brothers as to the filling up of this lake at the upper end, and as to what he said at the time regarding the character of this pond and as to the necessity and probability of its having to go or be filled up in the near future.

Upon this point, I may say that from the view which was presented to the court, that which at present has the appearance of being a pretty lake and an ornament giving it a find landscape character, nevertheless, taking into consideration, its nearness

to the city of Cleveland, that in the end the plaintiff will be pecuniarily benefited by having the dry land appear where the pond now stands. At all events, on this one point, the injury to the plaintiff, by cutting of this stream, even though it is to be held and taken as a water-course, and the removal of this pond as a matter of dollars and cents, is so disproportionate to the injury which this injunction must work to the defendants in depriving them of the use of their property in their efforts to lay out lots and in the building of residences and the making of homes to be occupied as such, that upon balancing the conveniences upon one hand and the inconveniences and injury upon the other, that the case is wholly with the defendants, and that a court of equity ought not, under the rule which I have previously stated, tie the hands of the defendants in such a case where they would be so seriously and greatly injured and inconvenienced, in order to maintain a relative small benefit and convenience due the plaintiff.

The rule of law in regard to watercourses and the rights, duties and obligations of riparian proprietors, depend very much upon circumstances. The measure of right in regard to streams and brooks in the country, for instance, in farming communities and where the owners are engaged in a agricultural pursuits, the raising of stock, can hardly be taken as the measure of right, duty and obligation in urban communities and upon the out-skirts of a city.

The city of Cleveland is a large commercial city, rapidly growing in population and extending its boundaries in all directions. This it is enabled to do by the street car lines which extend in every direction into what was recently suburban property, and where farming lands lying adjacent to a city are rapidly becoming a part of the city and are needed for the erection of homes for the people, a different rule must be applied. A few years ago, perhaps, no one thought of the city extending out as far as it has in this direction, and the period is not very remote when the hamlet of Glenville will become a part of the city of Cleveland. This twenty-two acres now owned by the defendants has come into demand and can no longer be regarded as part of a farm, but it is in reality urban property, and it is to be laid out into city lots streets to intersect it and sewers must be necessarily constructed, and all the improvements made that relate to property of that description. And the rights which may properly inhere and be enforced in these twenty-two acres of land were it to be regarded simply as farming property, must give way to the march of progress and the needs and requirements of a modern civilization and progress. And to apply this to the present controversy the defendants are doing only what they have a right to do upon their own land, in the improvement thereof. This allotment cannot be laid out in lots and dwelling houses erected on these lots without sewers and other improvements; cellars must be dug, water pipes must be laid, sewers constructed—necessarily this will interfere with percolating waters and with the sources of streams. I cannot conceive how the defendants can make the improvements that they desire to make and are about to make in the laying out of this allotment without intercepting and cutting off the water supply that is said to come down from their land to the plaintiff's premises.

If this injunction is to stand and the defendants prevented from constructing these sewers, then the improvements projected must stop where they are, and possibly it would result in this, that the boundaries of the city of Cleveland could go no further than they have already reached in this direction.

This view of the case can not be and ought not to be laid out of view in the dispositon of this motion to vacate the order of injunction heretofore granted.

I have thus hastily given the reason for vacating and setting aside the injunction which has been issued in this action. I do this with some reluct-

ance, for the reason that I am convinced that the plaintiff esteems and feels that the cutting off of the supply of water for this lake, at least so far as that supply has come from the defendants' land, is a serious loss.

But even if the court should, upon the present hearing, refuse to grant this motion and allow the injunction to stand, I am satisfied from all of the testimony that it will be but a short time that the plaintiff's premises will be largely benefited, if the land is drained and the ravine filled.

This being the view of the court, it is ordered that the injunction order heretofore issued, be vacated and set aside.

M. W. Cope, Judge Pennewell, for Plaintiff

Dawley & Nason, for Defendant.